THE STATE OF NEW HAMPSHIRE

SULLIVAN, SS                                                    SUPERIOR COURT

Docket No. 220-2025-CV-00096

SHERIDAN T. BROWN

*Plaintiff*

v.

TOWN OF GRANTHAM, PETER GARLAND and JEREMY WALLA

*Defendants*

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF, RESTITUTION, AND CIVIL PENALTIES WITH JURY DEMAND

NOW COMES Sheridan Brown, pursuant to RSAs 491:7, 491:22, and 498:1; and 42 USC §1983, and respectfully petitions this Court for declaratory relief, restitution, and civil penalties, stating as follows:

### INTRODUCTION

1.     The Plaintiff seeks declaratory relief from a municipal ordinance enforcement action initiated by two Grantham Selectmen, Peter Garland and Jeremy Walla, with reckless disregard for state law and the Plaintiff's constitutional rights. Purporting to be acting under the authority of the Town's Transfer Rules and Regulations, Selectmen Garland and Walla engaged in an *ultra vires* procedure to revoke Plaintiff's access to the transfer station—a privilege provided to all Grantham residents.

2.     Rather than initiating proper enforcement proceedings for an alleged ordinance violation via a summons from the Grantham Police Department or an alternative

1

mechanism authorized by statute, Selectmen Garland and Walla revoked Plaintiff's Transfer station access via letter and without any opportunity to be meaningfully heard beforehand. Plaintiff is not the first person subjected to this process, which circumvents the procedural safeguards of the State's criminal code. The Town currently offers only one mechanism for one Plaintiff or any other party to have their Transfer Station access restored.  A party who has had their Transfer Station access revoked must come before the Selectboard at a public meeting (with no opportunity to examine witnesses), admit wrongdoing, and offer an apology.

3.      This policy has been used to stifle free speech uttered by Transfer Station users in defense of their rights and in response to demeaning treatment from Transfer Station Employees, who—until recently—included the son of a selectman. It has also deprived Plaintiff and other Grantham residents of due process and equal protection, forcing them to choose between a coerced apology (even when there is no ordinance violation) and the inconvenience and expense of arranging for private trash disposal.

**PARTIES**

4.      Plaintiff Sheridan T. Brown resides at 500 Dunbar Hill Road in Grantham, New Hampshire, and has a mailing address of P.O. Box 1035; Grantham, NH 03753.

5.       Defendant Town of Grantham (the "Town") is a municipal corporation with a principal place of business of 300 Route 10 South in Grantham, New Hampshire 03753 and the same mailing address. The Town's three-member Board of Selectmen (the "Selectboard") is its governing body and zoning enforcement officer.

6.      Defendant Peter Garland is a member of the Grantham Selectboard who resides at

25 Catamount Road in Grantham, New Hampshire 03753 and has the same mailing address.

7.      Defendant Jeremy Walla is a member of the Grantham Selectboard who resides at 151 Rawson Ridge in Grantham, New Hampshire 03753 and has the same mailing address.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this complaint pursuant to RSA 491:22, RSA 491:7, and RSA 498:1. Under RSA 491:22, I:

> "Any person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties, and the court's judgment or decree thereon shall be conclusive. The taxpayers of a taxing district in this state shall be deemed to have an equitable right and interest in the preservation of an orderly and lawful government within such district; therefore any taxpayer in the jurisdiction of the taxing district shall have standing to petition for relief under this section when it is alleged that the taxing district or any agency or authority thereof has engaged, or proposes to engage, in conduct that is unlawful or unauthorized . . ." _Id._

9.      Pursuant to RSA 491:7: "The superior court shall take cognizance of civil actions and pleas, real, personal, and mixed, according to the course of the common law. . . of suits in equity under RSA 498:1. . . of all other proceedings and matters to be entered in, or heard at, said court by special provisions of law. . . and of all other proceedings and matters cognizable therein for which other special provision is not made." _Id._

10.     RSA 498:1 provides: "The superior court shall have the powers of a court of equity in . . . cases in which there is not a plain, adequate, and complete remedy at law; and in all other cases cognizable in a court of equity . . ." _Id._

11.     This Court also has subject matter jurisdiction to enforce violations of 42 USC

§1983, which provides:

> "Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . ." _Id._

The New Hampshire Supreme Court has held that state courts may entertain section 1983

actions. *MBC, Inc. v. Engel*, 119 N.H. 8, 10 (1979); *Royer v. Adams*, 121 N.H. 1024, 1026

(1981).

12.     This Court has personal jurisdiction over Defendant Town because it is in Sullivan

County.

13.     This Court has personal jurisdiction over Defendants Garland and Walla because

their residence is in Sullivan County.

14.     Venue in Sullivan County is proper because it is the location of the Town and the

place where both Plaintiffs and all Defendants are domiciled.

## STATEMENT OF FACTS

15.     The Plaintiff has been a resident of Grantham, New Hampshire for nearly 14 years.

16.     Throughout the entirety of Plaintiff's nearly 14 years Grantham, the Town has

operated a transfer station where all Grantham residents may dispose of household trash,

recyclables, construction and demolition debris, brush, and leaves in accordance with the

Town's Transfer Station Rules then in effect.

17.     Throughout the entirety of Plaintiff's nearly 14 years Grantham, the Plaintiff has

4

utilized his transfer station access in accordance with the Town's Transfer Station Rules and Regulations.

18.    Throughout the entirety of Plaintiff's nearly 14 years Grantham, the Plaintiff has always checked in with transfer station staff before disposing of construction and demolition debris, brush, or appliances, in accordance with the Town's Transfer Station Rules and Regulations.

19.    In recent years, the Transfer Station has been a source of many complaints by residents to their Selectboard and fellow residents.  Upon information and belief, as many as a dozen Grantham residents have had "run-ins" with one or more Transfer Station staff in recent years. If they have verbally responded after being provoked by employee rudeness or combativeness, they have had their transfer station privileges revoked by the Selectboard.

20.    Until just recently, the Town's Transfer Station was run by the son of a Selectboard member.

21.    On January 8, 2025, the Board of Selectmen adopted bylaws governing the operation of the Transfer Station. See Town of Grantham, New Hampshire, *Transfer Station Rules, Regulations, and Fees*, Jan. 8, 2025. (attached as **Ex. 1**) (hereinafter "Bylaws").

22.    The Bylaws provide that: "All materials dropped off at the Transfer Station become the property of the Town of Grantham." *Id.* at 3.

23.    Upon information and belief, Transfer Station staff have been allowed to remove materials from the Transfer Station for private use rather than those materials (including metal and copper wire for which the Town could receive consideration) being disposed

of by action of the Selectboard as required for Town Property.

24.     Meanwhile, the Plaintiff has observed that numerous Grantham residents are allowed to obstruct the flow of traffic through the dump while they converse with the transfer station staff. To Plaintiff's knowledge, this disruption of Transfer Station operations has not been prosecuted as a violation of the Bylaws or even verbally warned.

25.     The Bylaws set the following penalties:

"First Offense: Written Warning

Second Offense: $100

Third Offense: $200

Fourth Offense: Revocation of privileges (time determined by Board of Selectmen, Town Administrator, or Transfer Station Staff)."

Town of Grantham, New Hampshire, *Transfer Station Rules and Regulations*, §VI (eff. 1/8/2025).

26.     The Bylaws provide that: "The Board of Selectmen reserves the right to bypass these steps if the violation is egregious." Town of Grantham Transfer Station Rules and Regulations, §VI, 3 (eff. 1/8/2025). "Egregious" is undefined in the Bylaws. *Id.*

27.     The Bylaws provide no mechanism by which a party may be heard prior to being penalized, and they provide no mechanism by which a party may appeal to have his transfer station access restored.

28.     To have their transfer station privileges restored, one must follow an unwritten, but now repeatedly used process: request a meeting with the Selectboard, appear in public session, admit wrongdoing, and offer an apology. There is no opportunity for the accused to call witnesses or be meaningfully heard.

29.    On August 2, 2025, Plaintiff drove straight to Transfer Station's compost/leaf pile upon arrival and disposed of several bags of leaves. Plaintiff's actions were based on an almost 14-year course-of-dealing during which plaintiff had never been asked to stop before proceeding to the leaf pile.

30.    On Plaintiff's way out from the leaf pile, Transfer Station Attendant Jim Pierce yelled to Plaintiff that he needed to stop before going "out back." Plaintiff clarified that Jim meant the leaf pile, and Jim said "everything." Plaintiff expressed his frustration, made a joke, got a quip back from Jim (whom Plaintiff has known for many years), and left the Transfer Station.

31.    The Town's Bylaws include no requirement to check in with Transfer Station staff prior to disposing of leaves at the leaf/compost pile. See Town of Grantham, New Hampshire, *Transfer Station Rules and Regulations*, Jan. 8, 2025

32.    Apparently, at some time recently, a sign was placed at the dump stating that residents must see an attendant before heading "out back." On August 2, 2025, Plaintiff reasonably interpreted the sign as meaning "out back" where the dumpsters for brush and construction debris are located.

33.    In the morning of August 3, 2025, Plaintiff brought a load of brush to the transfer station and stopped to check in with a different attendant. That attendant said he didn't need to look at it. Transfer Station Attendant Pierce noticed Plaintiff and yelled "Hey, looks like he got the message." Generally, that sort of comment is directed derisively at people who have difficulty grasping a concept. So, the Plaintiff responded by asking Mr. Pierce if he was sure he didn't want to get the calipers to make sure the brush was the

proper diameter and had been sufficiently seasoned.

34.     The Plaintiff also informed the Transfer Station staff that the Bylaws do not ask anyone to stop before going to the leaf pile, hence his confusion, and that he would get a copy of all ordinances via a Right-to-Know Request to make he wasn't missing anything.

35.     On the way out of the Transfer Station, Plaintiff jokingly yelled "Bye, Sweetie!" to Mr. Pierce, thinking the two were just engaged in a little give-and-take.

36.     August 3, 2025, at 3:48pm, Plaintiff returned to the transfer station with household trash and recyclables, as well as those he picked up from an elderly neighbor recovering from cancer. Transfer Station Attendant Ken O'Keefe refused to open the gate across the entrance to the transfer station, then leaned his head into the car and demanded that I read the sign at the entrance, which says in small font to "please plan to arrive 15-minutes early."

37.     The Transfer Station Rules and Regulations include similar aspirational guidance. Neither the Rules, nor the sign inform users they will be denied entry to the Transfer Station. When Mr. O'Keefe argued the point with Plaintiff, he informed Mr. O'Keefe it was imprudent to escalate the situation with a lawyer who was not going to roll over like other residents who have been demeaned by Transfer Station employees.

38.     Mr. O'Keefe responded by dramatically photographing Plaintiff's license plate and telling Plaintiff he was going to report him to the Grantham Police Department for "threatening him with the lawyer thing." He then allowed Plaintiff to enter the Transfer Station, where he disposed of his household trash and recyclables in minutes, leaving the facility well before its 4PM closing time.

39. On August 4, 2025, Plaintiff wrote to the Board of Selectmen to complain about his experience, detail his own actions, and share concerns about various aspects of transfer station operations. Plaintiff also filed a Right-to-Know request seeking to inspect public documents pertaining to transfer station operations. Brown to Grantham Board of Selectmen Letter of 08/04/2025 (attached as **Ex. 2**).

40. On August 6, 2025, The Town revoked Plaintiff's transfer station access. Via a letter signed by Selectmen Garland and Selectman Walla, hand-delivered by the Grantham Police Department (hereinafter the "August 6 letter"), the Town informed Plaintiff that neither he nor his vehicle were allowed upon transfer station property, which effectively cut off his wife's access to the Transfer Station also. See Garland-Walla Letter to Brown to of 08/06/2025 (attached as **Ex. 3**).

41. The August 6 letter does not reference a meeting of the Selectboard where the decision to revoke Plaintiff's transfer station access was reached. _Id._ Upon information and belief, Selectmen Garland and Walla acted without convening a properly noticed meeting.

42. At no time did Plaintiff fail to comply with the directions of the Transfer Station staff, and Selectmen Garland and Walla, and—in the alternative—the Selectboard, have not alleged otherwise. _Id._

43. The August 6 letter alleges that "asking to measure the diameter of the brush with a caliper and using name-calling, is considered rude and combative behavior that will not be tolerated by the Town of Grantham." _Id._ The letter further alleges that the Plaintiff "treated the staff with disrespect and made threats, stating that [I am] a lawyer and not

to be messed with." _Id._ These findings include multiple inaccurate facts.

44.     The August 6 letter does not provide any findings that the Plaintiff's conduct was "egregious" as required to skip other enforcement steps like a warning letter. _Id._

45.     Regardless, Selectmen Garland and Walla revoked Petitioners transfer station access purely based on Plaintiff's speech made in defense of his rights.

46.     On August 11, 2025, the Town published an agenda packet for its August 13, 2025 Selectboard meeting, which included a Monthly Report from Transfer Station Manager Dana Ramspott. In it, he proposes the following change:

> "_For many years_ it has stated in _small_ print on the Transfer Station Sign ("please plan your arrival 15 minutes before closing time"). I would like to _start_ enforcing this by closing the gate at 3:45pm on Thursday, Saturday, and Sunday this will give employees time to pick up and get prepared for the next day of operation. On Monday and Friday, the gate would remain open until noon."

> D. Ramspott, August 2025 Report to Grantham Selectboard (emphasis added)(attached as **Ex. 4**)

47.     Ironically, Mr. Ramspott also reported that "Two employees attended the Dealing with Difficult People class and said it was fantastic. We will be utilizing some of the things learned _in the future_ if necessary." _Id._ (emphasis added).

48.     To avoid an accumulation of trash, Plaintiff has been forced to interrupt a busy personal and professional schedule to arrange for private disposal of trash, leading to a partial loss of income. Plaintiff will also continue to incur expenses for the private disposal of trash while seeking judicial intervention.

49.     Plaintiff now has a fear that the Town will take further unlawful and retaliatory action against him for daring to inquire into municipal operations.

50.     Plaintiff suffers from Ehlers-Danlos Syndrome of the hypermobility type. This condition results in sprains, strains, and subluxations when not sufficiently managed with relaxation and regularly scheduled exercise. The Defendants' actions have interfered with Plaintiff's relaxation and exercise routine by forcing him to seek judicial intervention, exacerbating the chronic pain that accompanies Plaintiff's condition.

## CLAIMS

### COUNT I – THE TOWN HAS ACTED WITHOUT LEGAL AUTHORITY TO ESTABLISH AN ORDINANCE ENFORCEMENT MECHANISM OUTSIDE WHAT IS STATUTORILY PRESCRIBED

51.     It is a basic and well-established rule of municipal law that "[C]ities and towns have only those powers which are granted to them by the legislature. 'Municipalities that attempt to exercise . . . delegated power can only do so in a manner that is consistent with the provisions of the enabling statute.'" *Dugas v. Town of Conway*, 125 N.H. 175, 181 (1984) (quoting *Town of Tuftonboro v. Lakeside Colony, Inc.*, 119 N.H. 445, 448 (1979) (citations omitted).

   A.    *Enforcement of penalties for violations of non-land use ordinances is governed by the state's criminal code.*

52.     Pursuant to RSA 31:39, I, Towns may adopt bylaws (or ordinances) for the purposes specified therein. See also RSA 21:45 ("bylaw" and "ordinance" have the same meaning). Towns may enforce their bylaws "by suitable penalties not exceeding $1,000 for each offense to enure to such uses as the town may direct."

53.     It is clear from the plain language of RSA 625:9, v-a and long-established case law that enforcement of an ordinance's penalty provisions must be brought through the criminal code. Per RSA 625:9, II: "Every offense is either a felony, misdemeanor or

violation." The violation of a bylaw enacted pursuant to an enabling statute that neither specifies the penalty or offense classification, shall be deemed a violation, "and the penalties to be *imposed by the court* shall be those provided for a violation under RSA 651:2." RSA 625:9, V-a (emphasis added). In *Portsmouth v. Karosis*, the New Hampshire Supreme Court held that City of Portsmouth could only enforce fines for parking violations using the criminal code – not the small claims process. 126 N.H. 717 (1985). Whereas no other penalty is specified, a violation of the Town's Bylaws is deemed a violation under RSA 625:9, V-a and it must be enforced in accordance with state law.

54. Enforcement of an ordinance's penalty provisions may be initiated under the criminal code in one of several ways. If the criteria of RSA 594:10, I are met, a peace officer may make an arrest on a charge of misdemeanor or violation. Alternatively, a peace officer may issue a summons instead of arrest if the criteria of RSA 594:14 are met. If a municipality desires an alternative enforcement mechanism, it is limited to those provided by RSA 31:39-c and RSA 31:39-d.

55. Pursuant to RSA 31:39-c:

"Any town may establish, by ordinance adopted by the legislative body, a system for the enforcement of violations of any municipal code, ordinance, bylaw, or regulation and for the collection of penalties, to be used prior to the service of a formal summons and complaint. Such a system may be administered by a police department or other municipal agency." RSA 31:39-c, I.

"If the administrative enforcement system established under paragraph I is unsuccessful at resolving alleged violations, or in the case of a town that has not established such a system, *a summons may be issued* as otherwise provided by law, including use of the procedure for plea by mail set forth in RSA 31:39-d." RSA 31:39-c, III.

56.    Grantham's Town Meeting voters have not adopted an ordinance establishing a system for administrative enforcement options. The Town's options are therefore limited to those provided under the criminal code and RSA 31:39-d, which provides as follows:

> "In addition to any other enforcement procedure <u>authorized by law</u>, and regardless of whether a town has adopted an administrative enforcement procedure under RSA 31:39-c, a local official with authority to prosecute an offense under any municipal code, ordinance, bylaw, or regulation, if such offense is classified as a violation under applicable law, may issue and serve upon the defendant, <u>*in addition to a summons to appear in the district court*</u>, a local ordinance citation as set forth in this section. RSA 31:39-d (emphasis added).

57.    When the Town revoked Plaintiff's transfer station access, it enforced a violation through a process other than the criminal code or an administrative enforcement system allowed by RSA 31:39-c. Moreover, it enforced a penalty upon Plaintiff that exceeds $1000 for a single violation. Plaintiff is now forced to incur costs exceeding $1000 for alternative waste disposal, and his only alternative offered via the Town is to participate in the Town's unlawful public humiliation proceedings.

### COUNT II – THE TOWN HAS DEPRIVED PLAINTIFF OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO PROCEDURAL DUE PROCESS

58.    The United States Constitution provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1.

59.    Meanwhile, the New Hampshire Constitution provides: "No subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, *or privileges*, put

13

out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land . . .” NH CONST., art. 15. Law of the land in this article means due process of law.” *State v. Veale*, 158 N.H. 632, 636, (2009) (quotation omitted). “The ultimate standard for judging a due process claim is the notion of fundamental fairness.” *Id.* at 637 (quotation omitted).

60.    Lastly, “Every subject of this State is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.” NH CONST.,, art. 15.

61.    “[A] fair opportunity for rebuttal” is “among the most important procedural mechanisms for purposes of avoiding erroneous deprivations.” *Wilkinson*, 545 U.S. at 226, quoted by *State v. Veale*, 158 N.H. 632, 643 (2009). By establishing its unwritten and unlawful mechanism to enforce the Town Transfer Station Rules and Regulations, the Town has circumvented the due process protections that exist in the state’s criminal code. The Town itself refers to transfer station access as a “privilege.” The loss of this privilege without a fair hearing creates a coercive situation wherein persons who have not violated the ordinance will be compelled to appear publicly, admit wrongdoing, apologize, have selectively edited minutes published online and elsewhere, and allow the Town’s unlawful behavior to continue to avoid expense and inconvenience. And that appears to be the Town’s intent.

## COUNT III – THE TOWN HAS DEPRIVED PLAINTIFF OF HIS
## FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO SUBSTANTIVE DUE PROCESS

62.    Due process requires that an ordinance proscribing conduct "not be so vague as to fail to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." See In re Justin D., 144 N.H. 450, 453 (1999). The Town's ordinance lacks any regulation setting standards for speech, courteousness, etc. at the Transfer Station.

63.    Nonetheless, the Town revoked the Plaintiff's transfer station access based entirely on non-profane and non-threatening speech. Plaintiff was specific in mentioning he would pursue legal remedies precisely for the purpose of making his speech non-threatening to any reasonable person who is acting lawfully.

## COUNT IV – THE TOWN HAS DEPRIVED PLAINTIFF OF HIS FEDERAL AND STATE
## CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION AND FREE SPEECH

64.    The New Hampshire Constitution provides: "Free speech and Liberty of the press are essential to the security of Freedom in a State: They ought, therefore, to be inviolably preserved." NH CONST., art. 22. Meanwhile, the Fourteenth Amendment of the United States Constitution, by incorporation of the First Amendment, prevents states from making laws "abridging the freedom of speech." See U.S. CONST., amend. XIV, § 1 and amend. I.

65.    The Town's Transfer Station staff frequently allows certain patrons to stop and talk with them while their cars impair others' use of the facility, particularly seniors and persons with rheumatological issues like Plaintiff. While this disruption to transfer station operations is not considered to be a violation of the Transfer Station Rules, Plaintiff's speech has been treated as a violation. If one verbally pushes back about

15

Transfer Station policies or rudeness from its staff, instead of just kibitzing, they will receive a penalty that is not applied to those who actually disrupt transfer station operations.

**COUNT V – THE TOWN'S ENFORCEMENT ACTION HAS DEPRIVED PLAINTIFF OF HIS STATE CONSTITUTIONAL RIGHT TO OPEN GOVERNMENT**

66.    The "*selectmen* shall manage the prudential affairs of the town and perform the duties *by law prescribed*." RSA 41:8 (emphasis added). Meanwhile, "The public . . . has a right to an orderly, lawful, and accountable government . . ." NH CONST., art. 8. It is basic and well-established municipal law that selectmen have no power to act on behalf of a municipality individually or outside of a meeting in accordance with RSA Ch. 91-A.

67.    Several statutory provisions in particular are relevant to the actions of Selectmen Garland and Walla. First, pursuant to RSA 91-A:2-a:

> "I. Unless exempted from the definition of "meeting" under RSA 91-A:2, I, public bodies shall deliberate on matters over which they have supervision, control, jurisdiction, or advisory power only in meetings held pursuant to and in compliance with the provisions of RSA 91-A:2, II or III."

> II. Communications outside a meeting, including, but not limited to sequential communications among members of a public body, shall not be used to circumvent the spirit and purpose of this chapter as expressed in RSA 91-A:1."

68.    Second, pursuant to RSA 91-A:2, II:

> "Except in an emergency or when there is a meeting of a legislative committee, a notice of the time and place of each such meeting, including a nonpublic session, shall be posted in 2 appropriate places one of which may be the public body's Internet website, if such exists, or shall be printed in a newspaper of general circulation in the city or town at least 24 hours, excluding Sundays and legal holidays, prior to such meetings."

69.    Third, pursuant to RSA 91-A:3:

"I. (a) Public bodies shall not meet in nonpublic session, except for one of the purposes set out in paragraph II. _No session at which evidence, information, or testimony in any form is received shall be closed to the public_, except as provided in paragraph II. No public body may enter nonpublic session, except pursuant to a motion properly made and seconded.

70.     RSA 91-A:3, II(c) allows a Board to meet in nonpublic session to discuss "matters which, if discussed in public, would likely affect adversely the reputation of any person, other than a member of the public body itself, unless such person requests an open meeting . . ." However, the Town cannot claim this exemption in good faith because its failure to provide proper notice of its meeting deprived Plaintiff of his right to request that it be open to the public.

71.     Plaintiff observed no notice of an August 5 or 6 meeting at the Post Office, where notices are customarily posted. Plaintiff's letter to the Town was transmitted via email on August 4, 2025, and the Town's revocation letter was two days later. Despite ample time, no notice of any meeting was placed on the Town's website, where such notices are customarily placed. Plaintiff alleges that Selectmen Garland and Walla either used an unnoticed meeting or sequential communications to intentionally circumvent the spirit and purpose of RSA Ch. 91-A in furtherance of the deprivation of Plaintiff's constitutional rights.

### COUNT VI - DEMAND FOR DAMAGES PURSUANT TO 42 USC §1983

72.     Plaintiff seeks nominal, actual, and punitive damages within the jurisdictional limits of this Court under 42 USC §1983, which creates a cause of action for deprivation of constitutional rights.

73.     42 USC §1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

74.     In a civil rights action, a jury will be permitted to assess punitive damages if the defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others. *Porter v. City of Manchester*, 151 N.H. 30, 46-47 (2004).

75.     Based on the facts stated herein, Plaintiff alleges that: (1) he was deprived of his constitutional rights to due process, equal protection, and free speech by the Defendants; (2) the deprivation occurred under color of state law by municipal officials purporting to be acting with legal authority; (3) the actions caused Plaintiff's loss of his constitutional rights; (4) and the Plaintiff was injured by these officials' actions as summarized in the statement of facts above.

76.     Plaintiff further alleges that the unconstitutional actions of Selectmen Garland and Walla involved both evil intent and/or reckless or callous indifference to Plaintiff's federally protected rights as detailed above because their actions are so far outside statutory authority and basic, well-established principles of municipal and constitutional law as to have no possible justification or proper motivation.

I.      *The Defendants are not immune from liability*

77.     Defendant Town is not granted statutory immunity from liability. RSA Ch. 507-B, which governs injury actions against governmental units limits only claims for "personal

18

injury" and "property damage." The constitutional violations alleged by Plaintiff fall into neither category as defined by RSA Ch. 507-B. Furthermore, the damages cap of RSA 507-B:4 does not apply to claims brought under 42 USC §1983. *Snelling v. City of Claremont*, 155 N.H. 674 (2007).

78.     Defendants Garland and Walla are also not granted statutory immunity from personal liability. RSA 31:104 only extends immunity to a member of a governing board who is "acting in his or her official capacity in good faith and within the scope of his or her authority." As detailed herein, Defendants Garland and Walla were not acting in good faith or within the scope of their authority when they violated basic and well-established constitutional and statutory limits on the powers of Selectmen.

79.     Defendants Garland and Walla are not immune from personal liability for their unlawful enforcement action against Plaintiff under the doctrine of official immunity. See *Everitt v. GE*, 156 N.H. 202, 219 (2007) and *Farrelly v. City of Concord*, 168 N.H. 430 (2015). First, Mr. Garland's and Mr. Walla's decision—outside the statutory enforcement authority afforded to municipalities—cannot be said to be "within the course" of their duties as selectmen. Second, Mr. Garland's and Mr. Walla's decision was ministerial rather than discretionary, as it involved enforcement rather than policymaking. Third, the decision was made in a wanton and reckless manner. There is no other way to characterize their total disregard for Plaintiff's constitutional rights and the statutory framework that makes sure due process is protected in enforcement of alleged ordinance violations.

80.     Defendants Garland and Walla are not immune from personal liability for their

unlawful enforcement action against Plaintiff under the doctrine of qualified immunity. A determination of whether the protection of qualified immunity extends to a government official's conduct is based upon: (1) whether the facts alleged or shown by Plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation. *Conrad v. New Hampshire Department of Safety*, 167 N.H. 69, 73 (2014). Both criteria are met here, as the constitutional rights violated by the Defendants and the limitations upon municipal authority are not even remotely new or undefined concepts of law.

81.     As to Defendants Garland and Walla, the damages cap of RSA 507-B:4 does not apply to claims brought under 42 USC §1983. *Snelling v. City of Claremont*, 155 N.H. 674 (2007).

## DEMAND FOR ATTORNEY'S FEES AND COSTS

82.     Each selectman has taken an oath of office to perform their duties "to the best of [their] abilities, and agreeably to the rules and regulations of [the] constitution and laws of the state of New Hampshire." As such, there is no valid excuse for the Selectboard members' failure to familiarize themselves with relevant laws and procedures and to follow them in ordinance enforcement.

83.     Bad faith by the Defendants justifies an award of attorney's fees in this case. Bad faith "is not limited to its narrow sense of an intentional disregard of duty or an intent to injure." *Indian Head Nat'l Bank v. Corey* 129 N.H. 83, 87 (1986), <u>quoting</u> *Murphy v. Financial Development Corp.*, 126 N.H. 536, 542 (1985). Bad faith "may be said to exist whenever 'an individual is forced to seek judicial assistance to secure a clearly defined and established

right, which should have been freely enjoyed without such intervention ... " *Id.*, quoting *Harkeem v. Adams*, 117 N.H. 687, 691 (1977).

84.    Furthermore, an award of attorney's fees to the prevailing party is warranted where the action has conferred a substantial benefit on not only the plaintiffs who initiated the action, but on the public as well. *Claremont Sch. District v. Governor*, 144 N.H. 590, 595 (1999), *citing Silva v. Botsch*, 121 N.H. 1041, 1043 (1981); *Irwin Marine v. Blizzard, Inc.*, 126 N.H. 271, 276 (1985); and *Mills v. Electric Auto-Lite*, 396 U.S. 375 (1970). Reimbursement is appropriate in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. *Id.* Such circumstances exist in this case, where the Plaintiff seeks to vindicate the rights of the Town's taxpayers to open government, due process, and equal protection.

*85.*    N.H. SUPER. CT. R. 87(a) provides that "[c]osts shall be allowed as of course to the prevailing party as provided by these rules, unless the Court otherwise directs." N.H. SUPER. CT. R. 45(a) provides: "The following costs shall be allowed to the prevailing party: Fees of the court, fees for service of process, witness fees, expense of view, cost of transcripts, and such other costs as may be provided by law. . ." *Id.*

**RIGHT TO AMEND**

86.    Plaintiff reserves the right to amend this complaint based on information obtained via discovery and Plaintiff's answer.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sheridan Brown respectfully requests that this Honorable Court:

A. Issue a Writ of Certiorari to the Town of Grantham commanding the Town to certify and return to the Court all records of its proceedings related to the enforcement of the Transfer Station Rules and Regulations.

B. Issue an order finding and declaring that the enforcement action taken by Selectmen Garland and Walla is not authorized under state law and, therefore, invalid and inapplicable to the Plaintiff.

C. Issue an order under this court's equitable powers requiring that Defendants Garland and Walla participate in continuing education sponsored by NH Municipal Association or other competent entity pertaining to civil rights and limitations on selectmen's authority.

D. Award nominal, actual, and/or punitive damages to the Plaintiff.

C. Award attorney's fees and costs to the Plaintiff.

D. Grant such other and further relief as it deems appropriate and just.


**JURY DEMAND**

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

## VERIFICATION

I, Sheridan Brown, do hereby depose and state that I have read the foregoing complaint, and the facts set forth herein are true and correct to the best of my knowledge, information, and belief.

Sheridan T. Brown (NH Bar #18911)
500 Dunbar Hill Road (NMR)
PO Box 1656
Grantham, NH 03753-1656
(603) 865-5231
sb@sheridanbrownlaw.com

**STATE OF NEW HAMPSHIRE**
**SULLIVAN, SS**

Before me personally appeared the above-named Sheridan Brown and made oath that the statements provided by him are true and correct to the best of his knowledge and belief.



Justice of the Peace/Notary Public
My Commission Expires: march 8, 2028

23

Respectfully submitted,

Sheridan T. Brown, *pro se*

Law Office of Sheridan T. Brown, PLLC

Dated: August 11, 2025             By:   _____

Sheridan T. Brown (NH Bar #18911)
500 Dunbar Hill Road (NMR)
PO Box 1656
Grantham, NH 03753-1656
(603) 865-5231
sb@sheridanbrownlaw.com

24

# Exhibit 1

PLAINTIFF'S EXHIBIT

1



# TOWN OF GRANTHAM NEW HAMP[SHIRE]

OFFICE OF THE SELECTMEN
300 Route 10 South, Grantham, NH 03753
Phone: 603-863-6021
www.granthamnh.gov

## Town of Grantham Transfer Station

### Rules, Regulations, and Fees

The following rules and regulations constitute an ordinance made by the Selectmen of the Town of Grantham for the proper operation of the Grantham Transfer Station.

**I. APPLICATION OF THE RULES AND REGULATIONS**

1. These rules and regulations apply to any person, firm, corporation, association, or municipality using the Grantham Transfer Station.
2. The Town of Grantham, upon its own motion or upon application and good cause shown, may modify, suspend, repeal, or amend the provisions of any rule or regulation contained herein. The sections of these rules and regulations and parts thereof are separable. If any portion of these rules and regulations, or the application thereof to any person or circumstance, shall be held invalid, the remainder thereof or the application of such invalid portions to other persons or circumstances shall not be affected thereby.

**II. DEFINITIONS**

1. **BUILDING CONTRACTORS**: Builders, Construction Contractors, and other Home Repair Contractors.
2. **BUSINESS GENERAL:** Any legal entity that generates waste within Grantham as a result of their business at a fixed location, e.g., stores, garages, condominium associations, and other commercial operations.
3. **LOCAL:** Located within the Town of Grantham.
4. **Needles:** Place in a sharps container or heavy-duty container clearly marked "sharps," seal tightly, and dispose of in the trash.
5. **HAZARDOUS MATERIAL**: Includes, but is not limited to, explosives, oils, flammable liquids, and chemicals.
6. **Human Waste:** Human waste (diapers) shall be double-bagged.
7. **STICKERS (NEW FOR 2025):** Pre-numbered sticker issued by the Town of Grantham for entrance to the Transfer Station.
8. **NON-LOCAL:** Located outside of the Town of Grantham.
9. **PET WASTE:** All pet waste shall be double-bagged.
10. **PROPERTY OWNER:** The person or persons who have legal title to an improved parcel of real estate in Grantham, NH.

11. **PUNCH CARDS**: Punch cards are issued by the Town of Grantham to be given to the Transfer Station Attendant for disposal of specific quantities of specific types of waste.
12. **REFUSE**: Includes all waste material generated in the Town of Grantham, NH.
13. **RENTER**: A Person who pays a sum of money to a Property Owner to live in their home, apartment, or room within the town of Grantham, NH.
14. **SEPARATION**: Controlled placement of reusable materials in specified locations for recycling purposes.
15. **TICKETS**: Tickets can be purchased online through the Town of Grantham's vendor for disposal of specific quantities of specific types of waste. They can also be purchased at the Selectmen's Office or via credit card at the Transfer Station at the time of disposal.
16. **TRANSFER STATION**:  The municipal transfer station is located at 1150 Route 114 in Grantham, where refuse is received, temporarily stored, and hauled to approved incinerators, landfills, or recycling facilities.
17. **BRUSH**:  Portions of trees less than six inches in diameter.
18. **WOOD**: Treated or untreated goes into the construction and demolition (known as C&D).
19. **YARD WASTE**: Includes leaves, grass clippings, garden debris, or chipped branches.

## III.    SCOPE OF RULES AND REGULATIONS
### PROHIBITED ACTIVITIES

1. It is strictly prohibited to dispose of refuse, construction debris, metal, wood, etc., except in specifically designated areas at the Transfer Station during the posted hours open to the public.
2. It is strictly prohibited to dispose of refuse without adhering a current sticker to the lower right passenger side windshield or showing a valid temporary pass.
3. It is strictly prohibited to walk barefoot at the Transfer Station.
4. It is strictly prohibited to allow children younger than 12 years old outside vehicles at the Transfer Station.
5. It is strictly prohibited to deposit burning or smoldering materials.
6. It is strictly prohibited to dispose of automobiles, animal carcasses, or slaughter remains.
7. It is strictly prohibited to dispose of asbestos.
8. It is strictly prohibited to dispose in the waste stream products containing mercury – State Law – see Appendix B for recycling of these items.
9. It is strictly prohibited to dispose of waste not generated in Grantham.
10. It is strictly prohibited to access the Transfer Station during closed hours.
11. It is strictly prohibited to leave trash outside the gate after hours or anytime the Transfer Station is closed.

### APPROVED OPERATION OF THE TRANSFER STATION

1. Hours of operation shall be determined by the Board of Selectmen, *SEE APPENDIX A,* and are posted at the Transfer Station or on the Town of Grantham website https://www.granthamnh.gov.

2. Trash and recyclables shall be accepted from Grantham residents, businesses, and non-resident property owners that have and proper display the hangtag or pass issued by the Town of Grantham's Selectmen's Office.
3. Everything being disposed of at the Transfer Station MUST have been generated in the Town of Grantham.
4. All materials dropped off at the Transfer Station become the property of the Town of Grantham.
5. Commercial haulers are allowed during all open hours of the Transfer Station.
6. Everyone using the Transfer Station shall observe the rules and regulations.
7. Everyone using the Transfer Station is under the jurisdiction of the attendants and shall comply with their directions.
8. All drivers shall obey the facility speed limit of 5 MPH and traffic signs.
9. All trash and recyclables shall be placed in designated areas. These areas are marked with appropriate signage.

## IV. STICKERS

Stickers are required to access the Transfer Station and must be adhered to the lower right, passenger-side portion of the windshield. Stickers can be obtained from the Town of Grantham's Selectman Office and are valid for one year from January 1 through December 31. There shall be no prorating of Sticker fees purchased part-way through the year.

Temporary Passes can be obtained from the Selectmen's Office on a case-by-case basis. See **APPENDIX C**.

### Residential Users:

The first two stickers shall be at no charge for a property where there is an occupied dwelling unit thereon. Each additional sticker is $10. If there is more than one Property Owner for one property, then the maximum number of no charge stickers shall be limited to two total. For example, if there are three Property Owners for one property, the maximum amount of no charge stickers is limited to two stickers total and not six stickers. Any additional stickers shall be $10 regardless of how many Property Owners there may be and is limited to properties that have an occupied dwelling unit thereon.

Renter: First Vehicle = $10. Each additional = $10.

### Commercial Users:

Local General Business: First Vehicle = $50. Each additional = $10

Building Contractors: Must obtain a Temporary Pass from the homeowner.

Refuse Haulers:   First Vehicle = $200. Each additional = $100.

1. All Residential or Commercial Users using the Town of Grantham Transfer Station must follow facility policies and may only bring materials generated in the Town of Grantham for disposal.
2. Building Contractors MUST present a Transfer Station Temporary Pass SEE APPENDIX C in order to dispose of Grantham-generated demolition C&D debris. The Property Owner must obtain a Temporary Use Pass from the Town of Grantham's Selectman Office, which is valid for a limited period of time.
3. The Grantham Transfer Station accepts residentially generated household waste, though it reserves the right to refuse any materials that it deems hazardous and may not be able to dispose of safely.
4. The Grantham Transfer Station will adhere to requirements, all passes, contracts, State laws (referred to as RSA'S), as amended, and local ordinances necessary to continue operations.
5. Grantham will sponsor a regular ***Residentially Generated Household Hazardous Waste Collection Day*** to be administered by a licensed and bonded contractor. This is generally held every even-numbered year during the summer, subject to Town Meeting approval.
6. The Grantham Transfer Station is NOT a hazardous waste facility and cannot accept or store hazardous waste. However, the transfer station attendants will assist any resident with information regarding the proper disposal of such materials whenever possible.
7. Although recycling is not mandatory in Grantham, we urge all residents to do so. This will help us meet the minimum percentage goal of 40%, as suggested by the New Hampshire Department of Environmental Services Solid Waste Rules.

## V. RECYCLING

The Grantham Transfer Station urges residents of Grantham to recycle. SEE APPENDIX B for a list of accepted recyclables. All materials being recycled must be dry and clean. Failure to abide by recycling requirements could result in the loss of Transfer Station privileges.

The Town of Grantham's recycling contractors have the right to refuse any load that they determine is not in compliance with their recycling rules and regulations. A refused load then needs to be transported to our general refuse contractor, and the Town of Grantham will incur the fee for disposal.

## VI. ENFORCEMENT

Failure to adhere to these rules, regulations, and direction of The Town of Grantham Employees may result in fines outlined below:

- First Offense: Written Warning
- Second Offense: $100
- Third Offense: $200
- Fourth Offense: Revocation of privileges (time determined by the Board of Selectmen, Town Administrator, or Transfer Station Staff).

a) Illegal dumping shall be enforced in accordance with NH RSA 163-B:3. Additionally, privileges to use the Grantham Transfer Station will be suspended for at least two

weeks. Subsequent violations will be subject to a longer period of suspension to be determined by the Board of Selectmen.

b) Anyone found on Transfer Station grounds during their period of suspension may be subject to enforcement for criminal trespass NH RSA 635:2.

2. Punch cards are required to be purchased in advance for construction and demolition debris as determined by the Transfer Station Attendant for the specific refuse. SEE APPENDIX A for the fee schedule.

3. The Board of Selectmen reserves the right to bypass these steps if the violation is egregious.

VII.  EFFECTIVE DATE
These revised Rules and Regulations shall be effective ___1|8|2025___, per order of the Board of Selectmen of the Town of Grantham.

*The Original was adopted on June 24, 1987.*

**APPROVED AND ADOPTED**

By the Board of Selectmen ___1 / 8 / 25___, 2025

Peter Garland, Chairman

Constance Jones

Warren Kimball

This page intentionally blank

# Appendix A – Fee Schedule



## Grantham Transfer Station

## "Mount Trashmore"

1150 Route 114, Grantham, NH 03753

Telephone:  603 863-9713    Fax: 603 863-4499
www.GranthamNH.Gov

---

**Transfer Station Stickers are required and expire December 31st of each year.**

**You must stop and see an attendant when disposing of items on this list.**

## HOURS OF OPERATION

(CLOSED Tuesday and Wednesday, and all Town Holidays)

| | |
|---|---|
| Sunday | 9:00 AM – 4:00 PM |
| Monday | 8:00 AM – 12:00 PM |
| Thursday | 8:00 AM – 4:00 PM |
| Friday | 10:00 AM – 4:00 PM |
| Saturday | 8:00 AM – 4:00 PM |

**\*\*Please arrive 15 minutes prior to closing\*\***

==YOU MUST SEE AN ATTENDANT BEFORE DISPOSING ANY OF THE FOLLOWING:==

| Heavy C & D | Asphalt shingles, sheetrock, plasterboard, tile, wood windows | |
|---|---|---|
| | Large truck, short bed | $80.00 |
| | Large truck, long bed | $110.00 |
| | Small truck, short bed | $45.00 |
| | Small truck, long bed | $65.00 |
| | 1-Ton Truck | $160.00 |
| | SUV, large | $65.00 |
| | SUV, small (car sedan) | $35.00 |
| | Van | $110.00 |
| | Trailer 4' x 6' | $45.00 |
| | Trailer 5' x 7' | $80.00 |
| | Trailer 8' x 16' | $220.00 |

**Wood Windows** - $5.00 per window; after five windows, the load price applies.
**Slider doors** - $15.00 per slider

| Light C & D | Wood, Plywood, Insulation | |
|---|---|---|
| | Large truck, short bed | $30.00 |
| | Large truck, long bed | $40.00 |
| | Small truck, short bed | $20.00 |
| | Small truck, long bed | $25.00 |
| | 1-Ton Truck | $100.00 |
| | SUV, large | $25.00 |
| | SUV, small (car or sedan) | $20.00 |
| | Van | $40.00 |
| | Trailer 4' x 6' | $20.00 |
| | Trailer 5' x 7' | $30.00 |
| | Trailer 8' x 16' | $75.00 |

**Countertops** - $10.00 per for small pieces, and load prices for larger quantities.
**Cabinets** - $5.00 per cabinet.  If broken down, go by load price.

## ==YOU MUST SEE AN ATTENDANT BEFORE DISPOSING ANY OF THE FOLLOWING:==

| Mixed C & D | Combo of light & heavy; includes carpet, padding and throw rugs | |
|---|---|---|
| | Large truck, short bed | $60.00 |
| | Large truck, long bed | $80.00 |
| | Small truck, short bed | $35.00 |
| | Large truck, long bed | $50.00 |
| | 1-Ton Truck | $130.00 |
| | SUV, large | $50.00 |
| | SUV, small | $30.00 |
| | Van | $80.00 |
| | Trailer 4' x 6' | $35.00 |
| | Trailer 5' x 7' | $60.00 |
| | Trailer 8' x 16' | $160.00 |

| **Appliances** | | |
|---|---|---|
| | Microwave | $10.00 |
| | Refrigerator /Freezer doors removed | $10.00 |
| | Water Coolers | $10.00 |
| | De Humidifiers | $10.00 |
| | Air Conditioners | $10.00 |

| **Doors** | | |
|---|---|---|
| | Wood/glass paned (per door up to 4) | $10.00 |
| | Hollow (per door up to 4) | $10.00 |

If more than 4, the charge is per load at the light C&D rate.

| **Carpets** | | |
|---|---|---|
| | 8 X 10 Carpet / Rug | $10.00 |

==YOU MUST SEE AN ATTENDANT BEFORE DISPOSING ANY OF THE FOLLOWING:==

## Empty Propane Tanks – no commercial-size bottles accepted

| | |
|---|---|
| 1 lb. | $1.00 |
| 1.5 and 2.5 lb. bottles | $2.00 |
| 20 lb. | $5.00 |

## Electronics

| | |
|---|---|
| Televisions | $20.00 |
| Monitors | $10.00 |
| Computer and laptops | $5.00 |
| Printers | $5.00 |

## Fluorescent light bulbs

| | |
|---|---|
| First 6 bulbs | FREE |
| Up to 4 feet (each) | $1.00 |
| 4 feet + (each) | $3.00 |

## Furniture

| | |
|---|---|
| Wooden and plastic furniture | $5.00 |
| Stuffed chairs/recliners/loveseats | $10.00 |
| Couches – regular sized | $20.00 |
| Sectional Couch **(fee is per section)** | $15.00 |
| Sleeper and hide a bed | $25.00 |

## Mattresses and Box Springs

| | |
|---|---|
| Mattresses (all sizes) | $50.00 |
| Box Springs (all sizes) | $15.00 |

## Hot Tubs/Bathtubs/Toilets

| | |
|---|---|
| Fiberglass/Acrylic | $20.00 |
| Porcelain | $30.00 |
| Toilets/Sinks | $10.00 |
| Covers for hot tubs | $10.00 |

## Boats

| | |
|---|---|
| Kayaks | $25.00 |
| Canoes/Sailboats | $30.00 |

**No Charge Items - anything metal, including:**

| | |
|---|---|
| Dishwashers | Stereos |
| Dryers | Stoves |
| DVD & VCR players | Telephones |
| Exercise equipment | Tires |
| Furnaces | Toaster ovens |
| Galvanized metal items | Typewriters |
| Grills | Vacuums |
| Keyboards | Washers |
| Metal window screens | Water heaters |
| Speakers | |

---

# APPENDIX B - Recycling

### RECYCLABLES

The following is a list of what can be recycled at the Grantham Transfer Station; we urge the residents of Grantham to do so.  **All materials being recycled must be dry and clean.**

The Town of Grantham's recycling contractors have the right to refuse any load that they determine is not in compliance with their recycling rules and regulations. A refused load must then be transported to our general refuse contractor, and the Town of Grantham will incur a fee for disposal.

**On January 2, 2008, New Hampshire law banned the disposal of mercury-added products at this facility, which includes** Fluorescent lamps, Rechargeable Batteries, Compact Fluorescent Lamps, Lithium Batteries, Thermometers, Fire and Carbon Dioxide Detectors, Thermostats, Tilt switches, Manometers, Button batteries, and any other rechargeable battery

1. **Batteries:** Rechargeable batteries, car batteries – **see Attendant**.

2. **CANS - ALUMINUM:** If it is aluminum, a magnet will not stick.  Some pet food cans are now aluminum.  CLEAN aluminum foil and pans are accepted in a separate bin.

3. **CANS - TIN:** All soup cans, canned vegetables, tuna cans, and aerosol cans.  If a magnet sticks to it, then it is tin.

4. **Cardboard:** All cardboard must be clean and dry.  Printed, colored, and shiny cardboard is accepted.  It is cardboard if you see corrugation when torn. NO CORRUGATION: SEE MIXED PAPER FOR WHAT IS ACCEPTABLE THERE.
   a. **NOT ACCEPTED: BEER CONTAINERS** are not recyclable as they have a special coating that does not allow them to break down during the recycling process, regardless of whether they are paper Board or cardboard.  ***These are to be disposed of in the trash.***
   b. **NOT ACCEPTED: HEAVY PACKAGING CORNERS AND MAILING TUBES** are not accepted by our vendor and need to be disposed of in the regular trash.

5. **Electronics:** A punch card is required for the disposal of electronics; see *APPENDIX A*.

6. **GLASS:** Beverage bottles and food jars are the only glass accepted in the glass bin. All other glass and ceramics go in C&D (bulky waste).

7. **Mixed Paper**: This includes clean paper, junk mail, newspapers, magazines, boxboard (e.g., cereal boxes), egg cartons, toilet paper, and paper towel tubes.
   a. **NOT ACCEPTED:**
      - Anything from the refrigerator or freezer (exception is egg cartons).
      - Anything "INTENDED" to be put in the refrigerator or freezer. These are items such as boxed juice pouches and other drinks.
      - Anything labeled "REFRIGERATE AFTER OPENING." This includes items such as stocks, broths, and boxed soups.
      - WRAPPING PAPER
      - USED PAPER TOWELS

8. **Oil – MOTOR ONLY**: Used motor vehicle oil and oil from machinery.  **Absolutely no cooking oil and no anti-freeze.**

9. **Plastics**:  All plastics #1 through #7 are accepted.  We do not accept plastic bags, plastic coat hangers, plastic toys, bubble wrap, or automotive oil cans (due to the oil residue inside the bottle). Check with your local supermarket for options to recycle plastic bags.

10. **Scrap Metal**: All white goods, ductwork, and sheet metal. Barrels, buckets, drums (tops removed), empty gas tanks, mufflers, catalytic converters, aluminum, structural steel, cast iron, brass, copper, exhaust pipes (cable, metal strapping, wire cut into 3' lengths). **\*\*REFRIGERATORS, FREEZERS, AIR CONDITIONERS, AND DEHUMIDIFIERS GO IN SEPARATE AREAS – A TICKET FOR DISPOSAL OF THESE IS REQUIRED – PLEASE SEE AN ATTENDANT.\*\***

11. **Tires**: Tires must be off the rims.  Rims are to be recycled in the Metal Bin.

## _ALL RECYCLING COMMODITIES BECOME THE PROPERTY OF THE TOWN OF GRANTHAM AND CANNOT BE REMOVED._



# TOWN OF GRANTHAM NEW HAMPSHIRE

OFFICE OF THE SELECTMEN
300 Route 10 South, Grantham, NH 03753
Phone: 603-863-6021
www.granthamnh.gov

## APPENDIX C – Transfer Station Temporary Pass

### Homeowner Information:

Name: _____    Daytime Phone: _____

Property Address (in Grantham): _____

Materials Being Disposed:    ☐ Regular Trash & Recycling    ☐ Construction Debris

☐ Other (specify) _____

Person & Company Disposing of Materials: _____

License Plate #: _____

State Registered: _____

Make and Model of Vehicle: _____

Homeowner Signature: _____    Date: _____

### Contractor Information:

Person & Company Disposing Materials: _____

License Plate #: _____

State Registered: _____

Make and Model of Vehicle: _____

Contractor Signature: _____    Date: _____

### For Office Use Only:

#### THIS TEMPORARY PASS IS VALID FROM:

_____ TO _____

Issued By: _____    Date: _____

# Exhibit 2

# LONG RIVER LAW

500 Dunbar Hill Road (NMR) • PO Box 1656
Grantham, NH 03753 • longriver.law

Sheridan T. █████
Admitted in N█████
603█████
sb@lo█████

PLAINTIFF'S
EXHIBIT
2

August 4, 2025

Town of Grantham                                    via email and USPS Priority Mail
Board of Selectmen
c/o Town Administrator Emily Owens
300 Route 10 South
Grantham, NH 03753

**Re:    Lack of Transparency and Accountability at Grantham Transfer Station**

Dear Selectmen:

Transfer Station Attendant Ken O'Keefe doesn't care that I am contacting you. He doesn't care who I am (succinctly, a 14-year Grantham resident and taxpayer who has given tens of thousands of dollars in uncompensated professional services to our Town and local nonprofits serving it). He told me so this weekend. I don't take it personally, though, as it seems Mr. O'Keefe doesn't really care about other Grantham taxpayers and customers of the transfer station.

I am not surprised by Mr. O'Keefe's attitude, given the long-running lack of accountability and transparency at the transfer station. At some point, the Board of Selectmen must see through the distractions and performative busywork at the transfer station, exercise its oversight duties, and make the transfer station an entity that functions efficiently and with at least a modicum of customer service. If it can't, then it should outsource waste disposal to a private entity who can.

Before recounting my recent experience with Mr. O'Keefe, it seems worth noting some major flaws at the transfer station pertaining to safety and convenience. I've mentioned them to various transfer station staff and Town officials over the past years, months, and weeks, only to see nothing ever improve. We are well past the blame the prior management stage and to the point where current management and this Board must own the situation.

To great fanfare, the transfer station is replacing its compactor—a routine maintenance project that should have been anticipated and done sooner. Furthermore, the project will not introduce any redundancy or efficiency to the operation the way a second compactor might. The latter would be worthy of celebration. The new compactor will eventually break, the transfer station will close for a period of time, or residents will have to carry their trash to an inconveniently placed roll-off container. Sorry, seniors and persons with rheumatological issues.

Painting new lines on the pavement to guide traffic is also apparently a multi-year deferred maintenance project. For many years, there were four lanes of traffic upon entering the transfer station. Three lanes were for recycling drop-off, and one through-lane allowed traffic flow to the compactor and other parts of the transfer station. The paint, and the memory of efficient traffic flow, has long-since faded. Patrons often park haphazardly and hold court with the staff while blocking multiple lanes of traffic. It is not an assumption on my part regarding the regular kibitzing, by the way. It is the same parties most of the time, and one overhears the topics easily. Attendants do not instruct these people (whose company they actually enjoy) to park sensibly or move out of the traffic flow. Then traffic backs up to the gate.

The transfer station now has an aluminum can baler. That is great, but if it is inconvenient to navigate the recycling area, many people will simply throw away their recyclables to save time. It seems this project was prioritized for staff convenience, so perhaps conservation and economic benefits are not a motivating factor to keep things running smoothly.

Given the new level of supposed oversight at the transfer station, there is no reason for the Town to continue spending taxpayer dollars to dispose of construction and demolition (C&D) materials from persons with small quantities. Those folks are waved through without individual charge, but these materials still require disposal fees in the aggregate. Those fees should more properly be a user fee than a burden upon taxpayers at large. Taxpayers and contractors should not be made to pay more than their fair share to subsidize others' projects.

By institutionalizing the cost of C&D covered by the informal "small quantity" policy, the Town has obscured whether contractors and commercial haulers pay more or less than their fair share—or possibly in some cases nothing. Maybe that is the goal. In the same vein, one might wonder how much money our Town spends disposing of waste not generated in Grantham (but delivered to the transfer station by commercial haulers, contractors, etc.). How does the Town determine where waste is coming from. Can't commercial haulers simply go to Casella?

There seems to be only one category of transfer station users that is consistently policed and inconvenienced at the transfer station: average users who fail to notice a sign (perhaps obscured by traffic), make an honest mistake, or… worst of all … express frustration or inquire about the rationale behind various policies. Customer frustration should be unsurprising to the Town. It is a logical outgrowth of transfer station rules that are ever-changing, inconsistent, and accompanied

by no explanation or corresponding improvement to customer service and convenience. Perhaps that is because they exist primarily for staff convenience at any given time.

It was my turn to get barked at this weekend. On Saturday (August 2, 2025), I arrived at the transfer station and went straight to the leaf pile where I have dumped leaves for 14 years. On the way out, I said hello to Jim Pierce, who gruffly told me I needed to check in with an attendant before going to the leaf pile. Based on a 14-year course of dealing at the transfer station (and the Town's Regulations, which do not include leaves and brush among items for which one is required to see an attendant), I was surprised that this was a problem.

I expressed my disbelief and frustration, made a joke, and got a quip back in return from Jim. I thought that was the end of it. On Sunday, I stopped to see an attendant before proceeding to dispose of brush. That person said he didn't need to look at it, and Jim chimed in with, "Hey, looks like he got the message." I always welcome a good chirp from someone who can take what they give, so I asked Jim if he wanted to get some calipers and make sure everything was the correct diameter and properly aged. Seriously, why am I stopping and getting out of my car for people to NOT look at anything?

On the way out of the transfer station, I yelled "Bye, Sweetie!" to Jim for good measure. I've known Jim for a while, and I was sure he could handle it. For much of our nation's history, governmental policy has been shaped by criticism, humor, and people who could accept both.

Unfortunately, not everyone is made of sterner stuff like Jim. When I returned to the transfer station at 3:48PM on Sunday, Attendant Ken O'Keefe looked like a person in the midst of some sort of mental health episode (my opinion as a layperson). The gate to the transfer station was pulled halfway across the driveway, he was walking around agitated, and nobody could enter without waiting for several cars to exit. I soon learned that the purpose of this partial gate closure was so that Mr. O'Keefe could pedantically lecture customers to arrive earlier.

Mr. O'Keefe could have simply said to me: "We're closing in 12 minutes." Instead, he decided to attempt to demean me and asked me to read the sign at the entrance (with its small-font aspirational guidance to please plan to arrive 15-minutes before closing). He also lectured Joan Rachlin, who was driving behind me (another local volunteer and taxpayer who Mr. O'Keefe doesn't care about). Then he photographed her license plate.

I pointed out to Mr. O'Keefe that delaying me was only working against his stated goal of being able to close at 4PM, and I cautioned him that escalation is a bad strategy when an attorney is involved. We are not the type of people who shrink away or issue a coerced apology to some

infantile employee for fear of losing our transfer station privileges. We are more likely to have our interest piqued by mismanagement of taxpayer resources, unequal treatment, a lack of a rational basis for policy, and a concern for how others who don't understand the law are treated.

Mr. O'Keefe opted for escalation by telling me he was reporting me to the Police Department for "threatening him with the lawyer thing." He then dramatically photographed my license plate. I am troubled by the ease with which Mr. O'Keefe threatened to use the Police Department to harass me for something not even remotely criminal. Aside from wasting officers' time, terrorizing someone in the manner Mr. O'Keefe did may actually constitute criminal threatening under RSA 631:4, I(d)). It struck me that maybe this might not be his first time doing this.

Mr. O'Keefe displays the kind of arrogance and detachment from reality that undermines people's opinion of government sector employees. I arrived at the transfer station when I did because I stopped to pick up an elderly neighbor's trash. Ms. Rachlin arrived behind me because she had caregiver duties for a family member. We were both gone by well before 4PM. In Mr. O'Keefe's mind, however, our being less than a full fifteen minutes early (by all of three minutes) could be for no other possible reason than to disrespect him. It required atonement.

Grantham has many good Town employees who enjoy their jobs—Mr. O'Keefe doesn't appear to be one of them. So, I hope you will terminate his position and give him the opportunity to find his dream job, where he can be free to not care about anyone's time but his own, be unwaveringly revered, insult the people who write his paychecks, and have shifts that end with NASA precision. I bet every working person in Grantham would love such a job but, sadly, it only exists in Mr. O'Keefe's vivid imagination.

I recounted my experience to a couple of residents at the Post Office today. Their response: "Well, I bet we know who that was." While most people understand that municipal government will light at least some portion of their taxpayer dollars on fire through inefficiency, we still hope you won't blow the smoke into our faces by using them to employ people like Mr. O'Keefe.

Mr. O'Keefe doesn't care, but maybe you do. Until then, taxpayers must be a lot more interested and involved in transfer station issues.

Sincerely,

Sheridan Brown
Attorney and Counselor at Law

# Exhibit 3

**PLAINTIFF'S EXHIBIT**

**3**

# Town of Grantham, New Hampshire



OFFICE OF THE SELECTMEN
300 Route 10 South, Grantham, NH 03753
Phone: 603-863-6021
Website: www.granthamnh.gov
E-Mail: info@granthamnh.gov

Hand-delivered via Grantham Police Department,
Mailed to the Property Owner's Address

Wednesday, August 6, 2025

Sheridan Brown
500 Dunbar Hill Road
Grantham, NH 03753

Re: Transfer Station Privileges Revoked

Dear Mr. Brown:

During your recent visit to the Town of Grantham Transfer Station on Saturday, August 2, 2025, a Transfer Station Attendant asked you to check in before proceeding to the back dumpster, as indicated by a large sign. This procedure is in place to discourage improper disposal of metal, construction and demolition debris, and brush, which has occurred frequently due to short staffing. Your response to the staff, which included asking to measure the diameter of the brush with a caliper and using name-calling, is considered rude and combative behavior that will not be tolerated by the Town of Grantham.

Furthermore, during your visit on August 3, 2025, a Transfer Station Attendant requested that you try to arrive by 3:45 PM, as specified in the Transfer Station Rules and Regulations and on the entrance board. At that time, you treated the staff with disrespect and made threats, stating that you are a lawyer and not to be messed with.

As a result of your actions on both August 2, 2025 and August 3, 2025, your _**privileges**_ to utilize the services of the Transfer Station are hereby _**revoked**_ immediately. This revocation

will remain in effect until you meet in person with the Grantham Board of Selectmen to explain your behavior during a regularly scheduled Board meeting. These meetings occur twice monthly, and your appearance will take place during a public session. To schedule an appointment to appear before the Board, please contact the Town Administrator, Emily Owens, at the phone number provided or by emailing info@granthamnh.gov.

During the period of revocation, neither you nor your vehicle is allowed on Transfer Station property. Should you violate this revocation in any manner, the incident will be reported to the Grantham Police Department for possible prosecution under NH RSA 635:2 - Criminal Trespass.

The employees of the Grantham Transfer Station work very hard, often under difficult conditions, to assist our residents with the proper disposal of waste. We hope that during your time prior to meeting with the Board of Selectmen, you will reflect on your actions and consider a more positive approach moving forward.

Grantham Board of Selectmen

Warren Kimball, Selectboard Chair: _____, Date: _____

Jeremy Walla, Selectmen: _____, Date: 8/6/25

Peter Garland, Selectmen: _____, Date: 8/6/25

Cc: Board of Selectmen

Grantham Police Department

Grantham Transfer Station

**Exhibit 4**

PLAINTIFF'S
EXHIBIT

4



# TOWN OF GRANTHAM NEW HAMPSHIRE

GRANTHAM TRANSFER STATION
1150 Route 114, Grantham, NH 03753
Phone: 603-863-9713
www.granthamnh.gov

## Board of Selectmen Monthly Report – August 2025

- New Containers for Paper and Plastic have been ordered.
- Control Shed has arrived, and assembly will begin soon.
- Cameras are up and running.

Employees recently attended Fire Safety in Transfer Station Facilities. This class brought to light several issues that face employees daily and what steps we can take to avoid them.

Two employees attended Dealing with Difficult People class and said it was fantastic. We will be utilizing some of the things learned in the future if necessary.

For many years it has stated in small print on the Transfer Station Sign ("please plan your arrival 15 minutes before closing time") I would like to start enforcing this by closing the gate at 3:45 on Thursday, Saturday, and Sunday this will give employees time to pick up and get prepared for the next day of operation. On Monday and Friday, the gate would remain open until 12 noon.

Things I am working on:

- Quotes for a 40' long shipping container to store cardboard or aluminum in.
- Quotes for a used Backhoe, I will be looking into a Clean Diesel grant for replacement of Bobcat.
- Finishing up the installation of Variable Frequency Drive for the Compactor that the Town received a grant for.
- And of course, I await the permit from the State of NH regarding Food Scrap Diversion. So that program can start

Sincerely,

Dana Ramspott

Transfer Station Supervisor